[Civ. No. 11586. Fourth Dist., Div. Two. Feb. 24, 1972.]

FRED T. BUCK et al., Plaintiffs and Appellants, v.
MATTEE FOLKE VINCENT DAHLGREN et al., Defendants and Respondents.

## COUNSEL

Shirley A. Engel for Plaintiffs and Appellants.

Reid, Babbage & Coil and Donald F. Powell for Defendants and Respondents.

## OPINION

GABBERT, J.—In an action for the recovery of usurious interest, treble damages, and to set aside a trustee's sale, appellant, plaintiff below, appeals from the judgment in favor of respondent.

On May 23, 1963, appellant, a real estate land developer, placed an advertisement in the classified section of the Los Angeles Times in the "money wanted" section. The advertisement stated the borrower would pay 10 percent interest per annum in exchange for a $30,000 loan, and would secure the loan by a first deed of trust on 40 acres of real property valued at $140,000. Shortly thereafter, respondent, a native of Sweden who had been in the United States for only a few years and with little or no experience in the field of real estate lending, contacted appellant, went with him to view the property and agreed to loan the money. On May 31, 1963, appellant executed a promissory note in the amount of $30,000 to respondent; the note was secured by a deed of trust on the real property and provided for the repayment of the principal amount within three years and for interest at the rate of 10 percent per annum.

In June 1964 appellant paid respondent $3,000 as the first annual interest payment on the loan. In July 1964 respondent loaned appellant an additional $6,000. A consolidation and extension agreement was signed again providing for interest at the annual rate of 10 percent.

On June 1, 1965, appellant informed respondent he was unable to pay

the interest of $3,600, which was then due and owing on the consolidated loan. At appellant's request this interest was added to the principal amount of the loan and a new consolidation and extension agreement was executed, showing an indebtedness of $39,600. Again, the agreement provided for interest at the rate of 10 percent per annum.

On June 1, 1966, the principal amount of $39,600 and the interest thereon in the sum of $3,960 fell due under the terms of the original loan agreement and the subsequent additions. Again, appellant was unable to pay the loan and requested a further extension for a period of one year. Appellant informed respondent such an extension would enable him to complete certain real estate development projects and thereby obtain sufficient funds to pay off the loan. In reliance upon appellant's representation, respondent extended the time for payment to June 1, 1967. The accrued interest on the preceding loan was added to the principal then due, resulting in a total principal indebtedness of $43,560.

After having obtained this extension of time within which to pay the principal amount, appellant suggested he prepay one year's interest on the $43,560. Accordingly, on July 2, 1966, appellant gave respondent a check for $4,300, with a notation thereon that $50 had been paid, the check and payment representing one year's interest on $43,560. Immediately after signing the new consolidation and extension agreement, respondent loaned appellant a further $7,000.[1] Consequently, the new principal indebtedness totaled $50,560, bearing interest at the rate of 10 percent per annum and was due and payable on June 1, 1967. Appellant also gave respondent a check for $641.70 as 11 months' prepaid interest on the additional $7,000 loan. The new promissory note

---

[1]The $7,000 which respondent loaned to appellant consisted of the $4,300, which respondent had received as prepaid interest, plus $2,700 from his personal savings account.

Respondent explained why he made this further loan to appellant:

"Q. . . . Would you have agreed to loan the money to Mr. Buck if he had not paid you his check in advance, if he had not agreed to pay you $4,300 in advance?

"A. Pardon me? Repeat that again.

"Q. Would you have consented to loan Mr. Buck $43,560 for one year if Mr. Buck had not paid you $4,300 in advance?

"A. I—I can't tell that for reason I waiting to him to tell me if he can raise the money or not. But when he come to the end of July, he told me that he can't raise the money. So he begged for to prolong it a year more.

"Q. I don't understand your last answer, what you mean from it.

"A. He begged me. He come, ask me and ask me over and over again. That was the reason he come up with that idea.

"Q. And, then, out of your concern for Mr. Buck, then, you agreed to accept $4,300 in advance and extend the loan for one year?

"A. I was concern I get my money back myself. And if I can help him to get his money loose, I will help me to get my money back."

contained an acknowledgement that $4,997.70 [*sic*] had been received as interest on the $50,560 indebtedness.[2]

On June 1, 1967, appellant advised respondent he was unable to pay the loan of $50,560 and needed an additional extension of time. Respondent indicated the loan could not be extended any further since he needed the funds for his own use for a business venture. Respondent instituted foreclosure proceedings and the trustee's sale was set for November 6, 1967. However, appellant induced respondent to extend the sale for one month for a payment of $500 on his representation that he intended to obtain the funds necessary for the payment of the loan from the sale of certain other property in Perris. Appellant requested and obtained one further extension of the sale for a $100 payment; this payment was also in consideration of an option to repurchase the property for the price paid at the trustee's sale.

The sale of the property under the trust deed was conducted on December 22, 1967, and respondent purchased the property for the sum of $55,711.34. The purchase price included the principal indebtedness of $50,560, interest at 10 percent per annum from June 1, 1967 on that amount, a penalty charge of $1,000, late interest of $282.29, and trustee's charges. At the time of the sale of the property under the trust deed, the fair market value of the property used as security for the loan did not exceed $40,000.

In its findings of fact, the trial court found the terms and conditions upon which the loans were made were suggested by appellant, including those terms concerning penalties and payment of interest. The court also found appellant induced respondent to make the additional loan of $7,000, thus increasing the total indebtedness to $50,560, with knowledge the security for the loan was worth substantially less than the principal. The court further found appellant had no intention nor reasonable anticipation of repaying the loan when he requested the extension of June 1, 1966, and at the time of the request anticipated foreclosure through a trustee's sale. Finally, the court found appellant's representation the loan would be repaid on the completion of the real estate projects was knowingly false, and made with the intention of inducing respondent's reliance.

From its findings of fact, the court concluded appellant was estopped

---

[2]Both payments by appellant of "prepaid interest" were subject to the provision in the loan agreement executed on June 1, 1966, which provided if the loan was paid prior to maturity any prepaid interest which was unearned would be credited to principal and would thereby reduce the total amount owed by appellant.

claiming the loans were usurious.[3] The court also concluded none of the various transactions were usurious.

On this appeal, appellant raises five major contentions:

(1) The transaction of June 1, 1966, was usurious as a matter of law;

(2) The receipt of $500 and $100 as a consideration for postponing the trustee's sale was a usurious forbearance;

(3) Respondent's purchase of the property at the trustee's sale constituted a usurious transaction;

(4) Estoppel is not a defense to usury; and

(5) The trustee's sale of December 22, 1967, was irregular and unfair.

As we shall discuss below, we conclude the trial court erred in determining none of the transactions were usurious: both the transaction of June 1, 1966, and the forbearance for $500 were usurious. However, the forbearance for $100 did not constitute usury. As we shall also discuss, respondent's purchase of the property at the trustee's sale did not constitute a usurious transaction since the amount bid was greater than the value of the property. Nonetheless, as we shall note, the trial court properly concluded appellant was estopped from asserting the claims of usury. Accordingly, we do not reach the question whether the trustee's sale was fundamentally unfair and we affirm the judgment.

As noted above, shortly after July 3, 1966, appellant executed a note in respondent's favor for $50,560. The total sum represented $43,560 ($39,600 previously owed, and $3,960 in interest for the previous year) and the additional $7,000 advanced by respondent. At the time the note was executed, appellant paid $4,300 as one-year's prepaid interest on the sum of $43,560; an additional payment of $50, previously overpaid in interest, was also credited toward prepayment of interest. On July 5, 1966, appellant paid respondent the additional sum of $641.70 as prepaid interest for 11 months on the additional $7,000 advance. Thus, appellant prepaid a total amount of $4,991.70 in interest on the amount due.

■ If a lender charges the maximum amount of interest permissible under the Usury Law, no interest may be lawfully collected in advance. If interest is deducted in advance from the loan, in testing the transaction

[3] "Plaintiffs are estopped from claiming the loans were usurious by reason of plaintiffs' conduct in concealing the true value of the land securing the loans and by misrepresenting their intentions of repaying the loan, and by initiating and suggesting those terms which plaintiffs now contend are usurious in nature. Plaintiffs cannot take advantage of their own wrong, nor can plaintiffs with unclean hands receive relief from this Court."

for usury the principal sum advanced will be considered as the amount of the loan *less* the interest deducted in advance. (*Taylor* v. *Budd,* 217 Cal. 262, 265 [18 P.2d 333]; *Haines* v. *Commercial Mortgage Co.,* 200 Cal. 609, 625 [254 P. 956, 255 P. 805, 53 A.L.R. 725].) Accordingly, rather than $50,560 appellant received only $45,568.30; for that sum, he paid $4,991.70 in interest. It is thus clear appellant paid interest in excess of the 10 percent rate permitted by law.[4]

The existence of the usurious interest charges was not diminished by the fact the promissory note included a provision allowing appellant to pay the note before maturity, and to apply the excess of interest received by respondent to the principal.[5] Although the total amount of interest paid was subject to a contingency, the actual rate of interest whenever paid would always have been usurious. Since the borrower had no control over whether the transaction would or would not be usurious, *Abbot* v. *Stevens,* 133 Cal.App.2d 242, 247 [284 P.2d 159] is not controlling. The lender would still be subject to treble damages for whatever total interest the borrower actually paid. Accordingly, the agreement of June 1, 1966, requiring the prepayment of 10 percent interest constituted a usurious transaction.

██ The record also demonstrates the exaction by respondent of the sum of $500 as consideration for postponing the trustee's sale was a usurious forbearance. A forbearance is an agreement not to insist upon payment at the date of maturity of a debt, or the giving of further time to pay. (1 Witkin, Summary of Cal. Law (7th ed. 1960) pp. 183-184; *Calimpco, Inc.* v. *Warden,* 100 Cal.App.2d 429, 440 [224 P.2d 421] (disapproved on other grounds, *Fazzi* v. *Peters,* 68 Cal.2d 590 [68 Cal. Rptr. 170, 440 P.2d 242]); *Eisenberg* v. *Greene,* 175 Cal.App.2d 326, 330 [346 P.2d 60].) On November 3, 1967, respondent agreed to postpone

[4]"No person . . . shall directly or indirectly take or receive in money, goods or things in action, or in any other manner whatsoever, any greater sum or any greater value for the loan or forbearance of money, goods, or things in action than at the rate of twelve dollars upon one hundred dollars for one year . . ." (Stats. 1919, p. lxxxiii; Deering's Gen. Laws, 1954, Act 3757.)

Article XX, section 22 of the California Constitution enacted after the California Usury Law (Stats. 1919, p. lxxxiii; Deering's Gen. Laws, 1954, Act 3757) specifies the permissible rate is ". . . 10 percent per annum upon any loan or forbearance of any money . . ." The 10 percent rate specified by the later enacted constitutional provision is the rate to be applied in determining whether treble interest is to be awarded under the Usury Law. (*Heald* v. *Friis-Hansen,* 52 Cal.2d 834, 839 [345 P.2d 457].)

[5]The provision read: "Maker shall have the right to pay the total amount due on this note at any time before maturity. In the event Maker so pays this note before the expiration of the first year, the excess of said sum of $4,997.70 [*sic*] over the interest accrued to date of payoff shall apply to the principal."

the trustee's sale scheduled for November 6, 1967, until December 6, 1967. Thus for the sum of $500, appellant was given one month further in which to pay the matured loan. Respondent therefore received .99 percent of the $50,560 debt for the one month forbearance, or an annual usurious rate of 11.88 percent.[6]

The $100 payment from appellant to respondent as consideration for further postponing the trustee's sale from December 6, 1967, to December 22, 1967, was not, however, usurious. The effective interest rate was less than 10 percent per annum; moreover, the extension was coupled with an option to repurchase the property after the sale.

■ The property securing the note was sold to respondent at the trustee's sale on December 27, 1967, for $55,711.34. The total included the principal indebtedness of $50,560, the $1,000 penalty charge, one percent penalty interest, interest on the principal indebtedness from June 1, 1967, and trustee's charges. Appellant contends that since, as we have concluded, the *true* principal indebtedness was only $45,568.30, respondent was in effect using the usurious interest at the trustee's sale. Appellant's position is supported by *Wheeler* v. *Superior Mortgage Co.,* 196 Cal. App.2d 822, 832 [17 Cal.Rptr. 291], which notes: "[t]he use of the interest due on the loan by the lender-bidder at the sale constitutes the equivalent of the payment of the interest by the borrower. Obviously, when this amount is bid, and it includes the usurious interest, it prevents any lower bid from being successful. The lender is actually using the amount of the usurious interest to obtain the property and, if successful, he has in effect collected the interest as the debt, including interest, is thereby fully satisfied. [See also *Penziner* v. *West American Finance Co.,* (1937) 10 Cal.2d 160 (74 P.2d 252).]"

However, neither *Wheeler* nor *Penziner* is controlling where, as here, the actual value of the real property purchased at the trustee's sale is less than the amount bid at the trustee's sale. Only where the value of the property purchased is greater than or equivalent to the amount bid has the bidder ". . . in effect collected the interest . . . ." Since the property purchased at the trustee's sale was worth no more than $40,000, respondent's purchase did not constitute a usurious transaction.[7]

---

[6]The record discloses no charges incurred by the lender because of the postponement of the trustee's sale.

[7]The trial judge filed an extended, complete Notice of Intended Decision. Findings of fact were later signed in general accordance with the Notice. In the Notice, referring to the market value of the property at the foreclosure sale the judge stated:
"There is no dispute as to the fair market value of the property received by

■  The California courts have held the Usury Law was designed to penalize lenders taking advantage of unwary and necessitous borrowers. (See, e.g., *White* v. *Seitzman,* 230 Cal.App.2d 756, 761 [41 Cal.Rptr. 359]; *Wooton* v. *Coerber,* 213 Cal.App.2d 142, 148 [28 Cal.Rptr. 635]; *In re Washer,* 78 Cal.App. 759, 771-772 [248 P. 1068].)[8] In order to effectuate the statutory policy of protection, the courts have also regularly held a borrower and a lender are not *in pari delicto* in a usurious transaction and the lender may not assert an estoppel against the borrower simply because the borrower took the initiative in seeking the loan, knew of the usurious nature of the transaction, and paid usurious interest without protest. (*Stock* v. *Meek,* 35 Cal.2d 809, 817 [221 P.2d 15]; *Taylor* v. *Budd, supra,* 217 Cal. 262, 266-267; *Westman* v. *Dye,* 214 Cal. 28, 35 [4 P.2d 134]; *McClung* v. *Saito,* 4 Cal.App.3d 143, 153 [84 Cal.Rptr. 44]; *Teichner* v. *Klassman,* 240 Cal.App.2d 514, 523 [49 Cal.Rptr. 742]; *White* v. *Seitzman, supra,* 230 Cal.App.2d 756, 761-764; *Janisse* v. *Winston Investment Co.,* 154 Cal.App.2d 580, 587 [317 P.2d 48, 67 A.L.R.2d 225]; *Martyn* v. *Leslie,* 137 Cal.App.2d 41, 57 [290 P.2d 58]; *Martin* v. *Ajax Const. Co.,* 124 Cal.App.2d 425, 431 [269 P.2d 132]; *Babcock* v. *Olhasso,* 109 Cal.App. 534, 537 [293 P. 141].)

However, several relatively recent cases have recognized the potential conflict between the policy of the Usury Act which, by subjecting a usurious

---

defendants through the trustee's deed. The only evidence respecting its value was that of plaintiff Buck, an experienced real estate salesman and land developer, to the effect that at the time of sale same had a fair market value of not to exceed $40,000. Despite the amount bid, what the defendants actually received was a trustee's deed to the aforementioned property. Plaintiffs, on the other hand, received a discharge and satisfaction of an indebtedness substantially in excess of the value of the property. Even under their claim that the actual indebtedness was only approximately $47,000, they have gained a substantial benefit, and defendants a detriment. There is no evidence or any indication that lower bidders, other bidders or anyone other than representatives of the trustee, attended the sale. Certainly, there is no evidence of lower or other bidders being prevented from acquiring the property by reason of the trustee's bid made on behalf of the defendants. The latter is one of the elements essential to application of the rule of the cases relied upon by plaintiffs."

In addition to the foregoing, the trial judge also stated in the same document:

"By the testimony of plaintiff, Fred Buck, the fair market value of the property sold at the trustee's sale did not exceed $40,000, some $15,711.43 less than the sum bid on behalf of defendants at the trustee's sale, and at least $2,000 less than the principal loans advanced by defendants to plaintiffs, . . ."

[8]The purpose of usury statutes was stated by Lord Mansfield: "But these statutes were made to protect needy and necessitous persons from the oppression of usurious and monied men who are eager to take advantage of the distress of others, whilst they on the other hand, from the pressure of their distress, are ready to come into any terms and, with their eyes open, not only break the law, but complete their ruin." (*Browning* v. *Morris,* 2 Cowp. 791, 98 Eng.Rep. 1364.)

lender to a penalty of treble the amount of interest collected, is designed to discourage usurious loans, and the policy of Civil Code section 3517: "No one can take advantage of his own wrong." (See *Burr* v. *Capital Reserve Corp.*, 71 Cal.2d 983, 994 [80 Cal.Rptr. 345, 458 P.2d 185]; *McClung* v. *Saito, supra*, 4 Cal.App.3d 143, 152; *Golden State Lanes* v. *Fox*, 232 Cal.App.2d 135, 142 [42 Cal.Rptr. 568]; *White* v. *Seitzman, supra*, 230 Cal.App.2d 756, 761-764.) The conflicting policies have been resolved by allowing the trial court, in cases in which the borrower was the moving force in the usurious loan, a wide discretion in determining whether treble damages under the Usury Act should be awarded. Even though a borrower has been denied treble the amount of interest paid to his lender, however, he has been allowed to recover the total amount of usurious interest paid. "To deny the recovery of usurious interest paid simply because treble damages are not allowed as a punitive measure would shift the penalty for a usurious contract onto the borrower instead of the lender which is patently contrary to the law of this state." (*White* v. *Seitzman, supra*, p. 764.)

However, counsel has cited no case, and independent research has disclosed none, which squarely holds a borrower may *never* be estopped from recovering *both* treble damages *and* the amount of usurious interest paid. The cases do indicate, however, such a result is permissible under California law. In *Stock* v. *Meek, supra*, 35 Cal.2d 809, 817, Justice Traynor noted: "The theory of [the Usury] law is that society benefits by the prohibition of loans at excessive interest rates, even though both parties are willing to negotiate them. Accordingly, 'voluntary' payments of interest do not waive the rights of the payors. 'Payments of usury are not considered voluntary but are deemed to be made under restraint.' [Citation.] If no loophole is provided for lenders, *and all borrowers save fraudulent ones are protected*, usurious transactions will be discouraged." (Italics added.) In *Heald* v. *Friis-Hansen, supra*, 52 Cal.2d 834, 837, the court held: *"In the absence of fraud by the borrower,* the parties to a usurious transaction are not in *pari delicto,* and, where a loan agreement calls for usurious interest, the borrower may recover any interest paid." (Italics added.) Finally, in *Janisse* v. *Winston Investment Co., supra*, 154 Cal.App.2d 580, 587, Justice Peters stated: "It can readily be admitted that, under proper facts, the defense of estoppel is applicable to a charge of usury in this state."

As we shall discuss below, we conclude the facts of this case compel the conclusion appellant was properly estopped from recovering both the amount of usurious interest paid and treble damages thereon.

The usurious aspects of the transactions between the parties relate to the extensions of time and payments made in connection therewith. Not

only were these payments and the manner in which they were handled suggested and initiated by appellant, Fred T. Buck, they were (as the trial judge found) induced by his fraudulent representations.

Appellant here took the initiative in seeking the loan, he suggested the terms and conditions upon which the loans were made, including the terms concerning penalties and prepayment of interest. Appellant induced respondent to make the additional loan of $7,000 with knowledge the security for the total indebtedness was worth substantially less than the loan principal of $50,560.[9] Appellant had no intention or expectation of repaying the loan when he requested the extension in 1966, and anticipated foreclosure on the mortgaged property; appellant's representation the loan would be repaid upon completion of certain projects was false. Moreover, appellant was an experienced real estate developer, while respondent was a native of Sweden who had been in the United States for only a few years. Although he had an education in engineering at the time he came to the United States, respondent did not know much English and could not write in that language.[10]

[9] Appellant testified he purchased 79.10 acres of land for $375 per acre in 1959; the deed of trust to secure the loan was only on 40 acres of the purchase. The County of Riverside assessment lists for 1962 and 1963 showed the *entire* parcel to be assessed at $1,000, at one-quarter of full cash value. The Riverside County notice of assessed values, dated May 25, 1968, shows the full cash value of the property on which the deed of trust was given was $22,440.

[10] "A. . . . And he explained for me that some three years from now he say expect to be sewer in there and the land, say, will go up. For three years the property would be worth twice as much. So I get the impression that this impression that $30,000 on a $140,000 property, and with a future that is to be a sewer in there and lands go up, I shouldn't have no—no risk to risk my life savings. So I—I decide to put it in.

"Q. Well, did you have your money in the bank before?

"A. Yeah, have the money in the bank. But the bank pay interest only each quarter. So I asked them to delay it to get my quarter payment on the interest to have. He couldn't do that. Wanted it right away. So I make an agreement with the bank to—I borrow money from the bank so we cancel out the deal so I get less interest loss on my money.

"Q. How much interest were you getting on your money from the bank?

"A. At that time I think it was around five percent.

"Q. All right. And Mr. Buck offered you ten percent. Is that right?

"A. That's what it say in the ad."

"Q. (By Mr. Powell) Okay. Now, you say he came to your house on July 2 [1966]?

"A. July 2nd he come to my house.

"Q. And what was the discussion there?

"A. Yeah. He—he tried to convince me that I should prolong the loan. And I was —I didn't want to do that. So he come up with some idea, say and—that—that made it to agree with him. He—he mentioned about he had some development in Perris at that time.

"Q. Perris, California?

"A. Yeah.

"Q. Um hum.

As a result of appellant's avaricious machinations, in satisfaction of appellant's indebtedness, respondent holds title to property worth not more than $40,000. Appellant, on the other hand, received loans well in excess of that sum. The record thus discloses facts substantially more favorable to an estoppel than any of the cases cited above. In *White* v. *Seitzman, supra,* 230 Cal.App.2d 756, plaintiffs knowingly initiated and consented to the usurious transaction and indeed had originated it to evade the Usury Law. In *Janisse* v. *Winston Investment Co., supra,* 154 Cal.App.2d 580, and *Teichner* v. *Klassman, supra,* 240 Cal.App.2d 514, the borrowers initiated the transaction and knowingly paid the usurious amounts. In *McClung* v. *Saito, supra,* 4 Cal.App.3d 143, the borrower was the "guiding hand" in the illegal transaction, and led the plaintiff to believe the transaction was legal. In *Martin* v. *Ajax Construction Co., supra,* 124 Cal.App.2d 425, the borrower initiated the transaction and prepared the usurious contract. Finally, in *Stock* v. *Meek, supra,* 35 Cal.2d 809, *Martyn* v. *Leslie, supra,* 137 Cal.App.2d 41, and *Babcock* v. *Olhasso, supra,* 109 Cal.App. 534, the borrower knowingly paid the usurious exactions. At a minimum, the case before us is distinguishable from the foregoing cases on the basis of the fraudulent practices of the borrower, and on the extent of the involvement of appellant in carrying out the entire scheme, as well as on the resulting substantial loss to the lender. Appellant now seeks not only to retain the results of his fraud but also to mulct respondent further.[11]

In *Ryan* v. *Motor Credit Co.,* 130 N.J.Eq. 531 [23 A.2d 607], affirmed 132 N.J.Eq. 398 [28 A.2d 181], cited with approval in *Stock* v. *Meek, supra,* 35 Cal.2d 809, 818, the borrower had avoided the provisions of the New Jersey Small Loan Act by obtaining nearly 500 small loans from the same lender by using names "selected at random from telephone directories, from tombstones or taken from the thin air." The court held the purpose of the statute required a presumption the borrower was the aggrieved party, but that on the "overwhelming facts" there disclosed showing the fraudulent practices of the borrower, the court was justified in disregarding the presumption and in denying the borrower recovery both of interest paid and the statutory penalty. The court noted: "It is true that the penalties of the act seem to be directed solely to the lender, and the advantages or

---

"A. And he need some money to finish up that. And after that he should get some money loose to pay me off. And I didn't investigate that, so I took his word for it for I thought he was a reliable man, in my impression is a man is what I can see in him and what his—his goal is. And his goal was to work for his church. And he was Deputy Sheriff, and he didn't smoke. And he—he didn't like parties. So I thought a man like that can—cannot risk my money and my life savings."

[11]Appellant seeks not only the sum of $4,997.70 [*sic*] as interest paid, within two years prior to the commencement of the action, but, also, the sum of $29,108.79 as treble the amount of all interest paid within one year of the commencement of the action.

benefits, aside from the provisions permitting an outrageous interest charge by the lender, reserved solely for the borrowers. But these penalties were designed to prevent oppression of the weak and poor; they were not designed as rewards for the perfidy of the borrower. Where no oppression is involved, no advantage taken by the lender of the borrower, the transaction being entered into with the deliberate purpose of defeating the statute, the parties are both particeps criminis and in pari delicto, and the rule and not the exception applies. Certainly it was not the intention of the legislature to preclude the courts, in such cases, from finding as a fact that the parties were in pari delicto. It was not intended that the hand of the court should be forced, or that it should be stayed in the application of the fundamental principles of justice."

The particular and unusual equities of this case impel us to the conviction that the philosophy expressed by *Ryan* is most appropriately invoked here.[12] Accordingly, we conclude the trial court properly found appellant was estopped from claiming the loans from respondent were usurious.

The judgment is affirmed.

Kerrigan, Acting P. J., and Kaufman, J., concurred.

---

[12]Our conclusion appellant is estopped from claiming the loans were usurious eliminates the factual basis of his argument the trustee's sale was fundamentally unfair.